IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 1, 2021

## IN RE JAMES H., III

**Appeal from the Chancery Court for Weakley County**
**No. 23751     W. Michael Maloan, Chancellor**

_____

## No. W2020-01423-COA-R3-PT
_____

James H., II ("Father") appeals the termination of his parental rights to the minor child, James H., III ("the Child"). In April 2017, Ashley P. ("Mother") and Trinity P. ("Stepfather") filed a petition to terminate Father's parental rights in the Weakley County Chancery Court ("Trial Court"). Following a trial, the Trial Court terminated Father's parental rights on two grounds of abandonment due to Father's willful failure to visit the Child and willful failure to support the Child prior to Father's incarceration. The Trial Court further found that termination of Father's parental rights was in the Child's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J. M.S., and ARNOLD B. GOLDIN, J., joined.

Langdon S. Unger, Jr., Martin, Tennessee, for the appellant, James H., II.

Donald Capparella, Kimberly Macdonald, and Patrick Riley, Nashville, Tennessee, and Kent F. Gearin, Martin, Tennessee, for the appellees, Ashley P. and Trinity P.

## OPINION

## Background

Mother and Father were married to each other for approximately a year, and the Child was born in 2006 during the marriage. After Mother and Father divorced in 2007,

Mother was awarded custody of the Child. The Trial Court initially set Father's child support at $571 per month in March 2007. The Trial Court subsequently modified Father's child support obligation to $446 per month effective in April 2007. During the divorce proceedings, the Trial Court allowed Father temporary visitation with the Child consistent with Father's employment on a riverboat. Due to Father's employment, he was away from home for weeks at a time. According to Mother's testimony during trial, the Trial Court ordered in January 2009 that her proposed parenting plan would be adopted by the court but that Father's temporary visitation would be suspended pending completion of a psychiatric evaluation to determine whether Father was fit to receive visitation with the Child. Father was also to complete a parenting class. As stated by Mother, the court order provided that when Father completed those requirements, he could petition the court to reinstate his visitation.

Father completed a psychological evaluation that recommended that Father complete anger management treatment. Mother testified that in February 2009, the Trial Court ordered Father's visitation to be supervised by either Mother or the maternal grandmother "until he could prove that he was taking his med[ication] for no less than a year and that he completed anger management treatment." The parties had agreed that Father could visit with the Child on the weekends he was home from work from noon until 4:00 P.M. According to Mother, Father never filed any pleadings in the courts to modify this visitation order requiring supervised visitation. Father did not complete anger management classes prior to his incarceration, but he did complete it in 2017 while incarcerated.

The child support records demonstrate that Father made no child support payments after March 2012 until one payment of $5 made in 2015 after his incarceration. Father was arrested on March 15, 2013 in Kentucky and remained incarcerated at the time of trial in this matter. Father initially was found guilty of one count of rape following a jury trial but that conviction was vacated by an appellate court. On retrial, Father was found guilty of one count of first-degree rape with serious physical injury and two additional counts of first-degree rape. As a result, Father was sentenced to life imprisonment on the count of first-degree rape with serious physical injury and twenty years each on the two additional counts of first-degree rape. The criminal court ordered these sentences to be served concurrently.

Mother and Stepfather married in September 2016. At the time of trial, Mother and Stepfather had been married for nearly four years and had been in a romantic relationship for more than ten years. They had resided together since late 2011 and had a child together who was born in 2012. Mother and Stepfather (collectively, "Petitioners") filed a petition to terminate Father's parental rights in April 2017. In the petition, Petitioners alleged that Father had made no effort to visit the Child since his birth and had not supported the Child. According to the petition, Petitioners were seeking to terminate Father's parental rights to the Child based on the ground of abandonment as defined in Tennessee Code Annotated §

36-1-102(1)(A).   Father filed a letter addressed to the clerk of the chancery court, denying that he had abandoned the Child.

In January 2020, Petitioners filed a motion to amend, requesting that the petition be amended to include Father's most recent rape convictions that resulted in a sentence of more than ten years.  The motion was granted by a consent order.  Father filed an answer to the petition, denying that he had abandoned the Child by failing to visit or support the Child and that termination of his parental rights was in the Child's best interest.  Petitioners subsequently filed a second motion to amend the petition "to include more specific grounds of termination to be added."  Based on the motion to amend, it appears that Petitioners were seeking to add additional grounds relevant to putative fathers even though this was not a "putative father" situation.  This amendment was granted by the Trial Court in a subsequent consent order.

A trial was conducted in September 2020, in which the following witnesses testified: (1) Mother, (2) Stepfather, and (3) Father.  At the beginning of trial, Petitioners informed the Trial Court that they would not be pursuing the ground involving Father's sentence that was more than ten years because at the time of Father's second trial and resentencing, the Child was more than eight years old.

During trial, Mother testified that she regularly had problems with Father paying child support after child support was ordered.  She stated that she had filed three petitions for civil contempt due to Father's failure to pay child support.  Mother testified that she had not received any child support from Father from March 9, 2012 through June 29, 2015.

Mother testified that Father had not had a visit with the Child since Thanksgiving in 2008.  Mother explained that Father had attended supervised visitation for a few months during the divorce proceedings but that he had stopped coming to the visits.  According to Mother, Father would call her to say he was going to be late, would sometimes show up extremely late when the visit was about to end, or would not show up at all.  Mother testified that Father eventually just stopped showing up for the visits.  According to Mother, she never usurped or interfered with any mail communication from Father that was addressed to the Child.  Mother further testified that she was not aware of anything she had done to interfere with Father's ability to visit the Child before he went to jail.

Furthermore, Mother testified that Father had not petitioned the court to lift the restriction on his visitation; therefore, she or maternal grandmother had to supervise his visits with the Child.  According to Mother, Father had only sporadic visitation with the Child.  Mother testified that Father had called for the Child a couple of times at eleven o'clock at night but opined that these calls were inappropriate and too late to be calling a toddler or minor child.  Mother further testified that Father had left presents at Mother's home for the Child and had come to the home when the Child was not there.  Although she did not recall the specific gifts, Mother testified that Father had left presents for the Child

at the home for two or three years after the divorce, always in the month of May. Thereafter, the presents stopped until after Father was incarcerated. Mother stated that Father had gone "months at a time" without paying child support for the Child, and "even years at certain points."

Mother testified that Father initially sent correspondence to Mother after he was arrested but that she had tried to stop that by contacting the jail where Father was located. According to Mother, Father continued sending letters to her and she returned one letter to him. That returned letter was addressed to Mother directly, and she included an inscription telling Father to "[g]et a life." Father subsequently began sending correspondence to the Child instead of Mother. Mother stated that these letters to the Child did not begin until Father had been incarcerated for a few years and that the Child received a letter from Father every two or three months. Mother testified that Father had also sent the Child three gifts while he had been incarcerated: an adult watch, an adult guitar, and a book.

According to Mother, the Child knew that there was someone else who was his father but that the Child wanted Stepfather to be his dad. Mother stated that the Child had began asking if Stepfather could become his "real dad" in about 2016. According to Mother, the Child refers to Stepfather as "Dad" and Stepfather has been a father to the Child for ten years. She described Stepfather's relationship with the Child as "a typical father/son relationship." Stepfather and the Child "do a lot of construction" together. According to Mother, the Child likes helping around the house and the Child helped Stepfather patch the roof of the house. Stepfather helped the Child with a book for Cub Scouts, which included learning about electricity, woodworking, and whittling. Stepfather was at the Child's "campouts" and picnics and had assisted the Child with badges.

Stepfather had been employed full time at MTD Products for over eight years. At the time of trial, he was working as a forklift operator. Stepfather testified that he had known the Child since he and Mother started dating in 2008 and that the Child had been calling him "Dad" consistently for at least six or seven years. In public, Stepfather introduces the Child to people as his son. According to Stepfather, he loves the Child and is committed to him. Stepfather had been providing necessities to the Child, including food, clothing, shelter, healthcare, transportation, and school, and testified that he was able to continue providing for the Child's needs. According to Stepfather, he and the Child would spend time together in the evenings after work and school, and unless the Child was with his grandparents, he was around Stepfather "almost every day." Stepfather testified that he attended everything that he was able to for the Child's Boy Scouts and Beta Club, that he assisted the Child with homework in the afternoons after he got home from school, and that he was supportive of the Child's endeavors. Stepfather further testified that the Child has a close relationship with his half-sister.

Stepfather did not recall Father ever coming by the home to visit the Child after he began living with Mother or ever hearing Mother tell Father that he could not come visit

the Child. Stepfather stated that he had spoken with the Child about the fact that he had a biological father and that Stepfather was not his legal father. Stepfather testified that the Child initiated the conversation concerning Stepfather adopting the Child and that the Child had asked him and Mother questions concerning what had occurred with the court case. According to Stepfather, the Child is supportive of the adoption.

Father was incarcerated in Kentucky at the time of trial. He participated in the proceedings via telephone and was represented by counsel during trial. Father acknowledged that he had received some traffic citations and that a case had been filed against him in Kentucky in January 2010 for "assault fourth degree – child abuse," to which he pled guilty. Father explained that he had "spanked [his] girlfriend's child in public." Father testified that as a result of this criminal conviction, he was not sentenced to any jail time. The criminal record reflects that a restraining order was entered between Father and the minor victim. Additionally, Father acknowledged a charge for marijuana trafficking in November 2011, to which he pled guilty and served five days incarceration. Subsequently in May 2012, Father was charged and pled guilty to making harassing communications. For that conviction, Father served three days incarceration of a ninety-day sentence. Concerning his current convictions, Father testified that he had been incarcerated continuously since March 15, 2013 and that he was appealing those convictions. Father testified that he was convicted of three counts of first-degree rape that all involved his wife and that he was also convicted of second-degree assault involving domestic violence.

Father testified that the Child had two older half-siblings in addition to Mother's and Stepfather's child. According to Father, his oldest daughter was almost nineteen years old, and he had not spoken with her since 2014. Father further testified that he did not have a relationship with his sixteen-year-old son because he did not have an address for that child's mother.

Father testified that in the divorce proceedings, he had contested the court's order that required Father to have only supervised visitation with the Child until he had been taking his medication for at least a year and had completed anger management classes. Father testified that he had attended three mental health evaluations performed by psychiatrists or psychologists in 2008 or 2009. According to Father, he was "cleared" by each psychologist/psychiatrist evaluation he had, did not have any mental disorders, and did not require medication. Father stated that he also contested the requirement that he complete anger management classes because they were not necessary and not feasible with his employment.

Father testified that in 2008 after the parenting plan was entered, Mother and a police officer told him that he was not allowed to come visit the Child. However, Father testified that he had visited the Child after that date. According to Father, the first time he was able to visit the Child was when Mother had contacted him and told him that he could visit the Child if he agreed to pay Mother's electricity bill. Father testified that Mother did

not have the money to pay the bill and her electricity was going to be shut off. He stated that it took him six hours that day but that he was able to get the money and had arrived at Mother's home between 3:00 or 3:30 P.M. He testified that after he gave Mother the money for the bill, he was able to spend time with the Child while Mother went to get the electricity turned back on because "they had shut it off early that day." Father testified that Mother allowed him to stay for dinner that night. Father further stated that at the end of that visit, he asked Mother if he could see the Child again, to which Mother agreed and gave him her cell phone number.

Father testified that Mother had allowed him to see the Child every Sunday when he was working excavation and rail work, but he had to call her by Friday to set up the visit. According to Father, this visitation continued for about three or four months in 2009 and 2010 before Mother's "phone number cut off." Father stated that he stopped by Mother's home but Mother instructed him to leave and informed him that she was calling law enforcement. Father testified that he told her that he needed a phone number to set up visits with the Child, and she said "no." Father further testified that he would go by the home and bring gifts for the Child but that Mother would not allow him to see the Child.

According to Father, the last time he saw the Child was in 2011 and the last time he attempted to see the Child was in 2012. Father testified that the last time he visited, he brought a half-sibling of the Child to visit as well. Father also stated that Stepfather was living at the home at that time because Stepfather's motorcycle was parked to the side of the driveway and Mother had told him Stepfather had taken his truck to work that day. Father stated that he tried to visit twice in 2012 and that one of those attempts was in March 2012 when he dropped off the Child's Christmas presents. According to Father, Mother met him in the driveway and told him that he could not see the Child. The second attempt was in fall 2012, but no one was at the home. When asked why he had not tried to visit after those attempts, Father testified that he began working on the riverboat again, was "trying to work [his] way back up," and was gone for thirty or forty-two days at a time and only home for a week or two at a time. According to Father, he was only home for a total of about six weeks from September 2012 through March 2013.

According to Father, while incarcerated, he had written letters to the Child "monthly without fail," sent the Child cards for his birthday and holidays, and sent gifts for the Child when he could. Father testified that he had sent the Child two guitars, a guitar strap, a watch, and some books. Father stated that he had not received anything back from the Child in response to his correspondence or gifts. However, Father testified that he received returned mail from Mother in 2013 that read: "Get a life. We have." According to Father, he continued to try to communicate with the Child despite the letter and sent things to family members in order to get them to the Child. Father stated that his sister had attempted to take the second guitar to the Child but that Mother had refused it and threatened to call law enforcement. Therefore, the Child had not received the second guitar. When asked how he was able to buy presents for the Child, Father testified that he worked in a barber

shop in the prison and in addition to his assigned state pay, he "charged people for the services of receiving their haircuts." The individuals seeking a haircut would bring Father bags of coffee as payment for their haircut. Father would then sell the coffee to "somebody that ran another illegal operation" at the prison. The person to whom he sold the coffee would then put money in his account that he used to buy gifts for the Child.

Father testified that each time he changed jobs before his incarceration, he would notify the child support office and it would take them five or six months to send the paperwork to start the wage assignment with his new employer. Father testified that he was unable to work for approximately a year following a car accident in August 2011 and was receiving unemployment benefits at that time. According to Father, he learned that he could send payments directly to the Central Child Support Receipting Unit and began doing that. According to Father, he had mailed cashier's checks from his bank to the receipting unit while he was on unemployment. However, Father later testified that he was not able to pay child support while he was on unemployment because the amount of unemployment compensation was "extremely low" and some of his bills did not get paid during that time. As a result of the lawsuit filed by Father concerning the accident, Father received compensation for damages in the amount of $5,000 in June or July 2012.[1] Father acknowledged that none of that amount went toward his child support and stated that he had to replace a vehicle. Father had started working again in September 2012 for the riverboat, where he worked until his incarceration.

Father completed an anger management class in 2017 while in prison. Father testified that he completed the following classes while incarcerated: (1) anger management classes, (2) anger management mentor class, (3) moral recognition therapy parenting, and (4) moral recognition therapy trauma for men. Father further stated that he also applied to take university courses to finish his degree in engineering. Father testified that it would not be in the Child's best interest for his rights to be terminated because he loves the Child and always wanted to see him and talk to him but that he had not been allowed. Father testified that he was grateful for Stepfather being a father figure to the Child and loving the Child as his own. However, Father testified that he still wants to be there for the Child. Father further testified that he was not a good husband and that he had "struck" his wife, which he acknowledged was unacceptable. Father, however, stated that he had tried to improve himself since that time.

Following Father's testimony, Mother testified for purposes of rebuttal. Mother testified that she never told Father he could not visit with the Child. Mother also stated that she never told Father he could visit with the Child if he paid her electric bill, that he never came to her house to see the Child for that reason, and that she never left the Child

---

[1] This amount was what Father actually netted. We note that the Trial Court found in its order that Father had received a net of $5,100 but that Father testified during trial to receiving $5,000. This discrepancy does not affect our analysis in any way.

alone with Father while she went to pay the electric bill. Additionally, Mother testified that Father's testimony about his last alleged visit with the Child could not be true because Stepfather had traded in his motorcycle to buy the truck when Stepfather learned Mother was pregnant with the Child's half-sibling, which she stated would have been shortly before the alleged visit. In response to Father's testimony that he attempted to visit the Child in March 2012, Mother testified that she had a C-section in March and would have been recovering from the procedure. According to Mother, Stepfather and the maternal grandmother were constantly at the home and that she was not left alone during that time. Additionally, Mother stated that she never received anything from the court reflecting that Father was seeking to enforce visitation.

Following trial, Petitioners filed a motion to amend the pleadings to reflect the abandonment ground as defined in Tennessee Code Annotated § 36-1-102(1)(A)(iv). According to Petitioners' motion, this ground was tried by the "express or implied consent of the parties" and the evidence during trial demonstrated that Father was incarcerated when the petition was filed and had abandoned the Child by his willful failure to visit or financially support the Child during the four months preceding Father's incarceration. This motion was granted by the Trial Court, and no issue is raised on appeal as to the granting of this motion.

The Trial Court subsequently entered an order terminating Father's parental rights on the statutory grounds that Father abandoned the Child by willfully failing to visit him and by willfully failing to financially support him prior to Father's incarceration. In its judgment, the Trial Court made the following findings of fact and conclusions of law:

> [Mother] and [Father] were married March 14, 2006. They have one child, [the Child], born [in] December . . . 2006. They separated February 13, 2007. This Court granted an absolute divorce to the mother by default on the grounds of inappropriate marital conduct on September 7, 2007. All other issues were reserved.

> Father filed a motion for specific visitation on February 11, 2008. The parties entered into a consent order filed April 25, 2008 setting temporary visitation consistent with father's employment on a riverboat. By order of January 12, 2009, this Court entered mother's permanent parenting plan. Father's parenting time was suspended pending a psychiatric evaluation. A document entitled "Psychological Evaluation" was filed with the Court on April 23, 2009, which recommended anger management treatment.

> Mother married [Stepfather] on September 17, 2016. They have one child together.

Father was incarcerated in the State of Kentucky on March 15, 2013 and remains in jail since that date. He was charged in Christian County, Kentucky on March 15, 2013 for rape in the first degree. After a jury trial, father was found guilty and received a life sentence. Although the record is not clear, father appealed this conviction, and the case was remanded to Christian County, Kentucky Circuit Court. A July 29, 2019 jury trial found father guilty of three counts of rape in the first degree and sentenced him to life imprisonment.

Child support records disclose father did not pay child support beginning October 10, 2007 to April 21, 2008; February 17, 2010 to December 15, 2008; July 30, 2010 through February 16, 2011; July 18, 2011 through January 5, 2012; and March 9, 2012 through September 29, 2015.

Father testified he attempted to visit his son, but his ex-wife would not allow visitation. The record is void of any petitions and orders to enforce his visitation after 2009.

Mother testified father's visitation before June of 2009 was "sporadic". She testified father's last visit with their son was Thanksgiving, 2008. She denies ever denying father's visitation. Father testified his last visit with his son in October of 2011.

Father testified he worked in the excavation business in 2009 to 2010. He was off work from October, 2011 to September, 2012 from an automobile accident. He received an $8,000.00 judgment against the other driver and received a net of $5,100.00, but paid nothing on his child support. Father testified he became employed on a riverboat in September of 2012.

* * *

[Mother] testified of her efforts to collect child support after the divorce and the father's failure to visit. The records of the child support enforcement agency reflect long periods of nonsupport. She testified father's last visit [was] in 2008. Father testified his last visit was in 2011.

Mother has remarried. Both she and her husband are gainfully employed. [The Child] has a father/son relationship with her husband. [The Child] refers to him as "dad." [The Child] is in the Beta Club and a straight "A" student at Martin Middle School.

[Stepfather] testified [the Child] asked to be adopted four and one half years ago. He testified he loves [the Child] and wants to adopt him.

Father testified he did not visit because the mother would not allow it. He was employed after the divorce, except for the period of an automobile accident. He became employed on a riverboat on September of 2012. He testified he sent letters and cards to [the Child] which mother denies. He never received a response from [the Child]. He could not contact [the Child by] telephone because he did not have a working telephone number.

Father testified he never completed the required anger management course due to his riverboat job, but he did complete a course in 2019 while in prison.

Father denies termination of his parental rights is in [the Child's] best interest. "I am still his dad. I want to see him. I love him."

Father has two other children. He has had no contact with them since 2013.

## GROUNDS

After trial, the Court ruled from the bench that [Father] had abandoned [the Child] by clear and convincing evidence that he willfully did not visit or support [the Child] for four (4) months before his incarceration in March 15, 2013. T.C.A. §36-1-102 (1)(A)(iv). Father failed to visit since 2008 by mother's testimony and since 2011 by his testimony. Father was gainfully employed on a riverboat from September, 2012 till the time of his incarceration and paid no child support. Father made no timely effort for the Court to enforce his visitation.

At the beginning of the trial, petitioners' attorney announced the amended ground of conviction of more than ten (10) years would be withdrawn. At closing, petitioners' attorney requested the Court to consider this ground which the Court denied.

## BEST INTEREST

The Court has considered all the relevant factors in T.C.A. § 36-1-113 (i) as to whether termination is in [the Child's] best interest. Father has failed to maintain regular visitation or other contact with the child. The physical environment of [Petitioners'] home is healthy and safe. [The Child] is doing exceptionally well in school. There is no meaningful relationship between [the Child] and his father. Therefore, the Court finds by clear and convincing evidence that termination is in [the Child's] best interest.

- 10 -

Thereafter, the Trial Court entered an order approving the Stepfather's adoption of the Child. Father timely appealed to this Court.

## Discussion

Although not stated exactly as such, Father raises the following issue for our review on appeal: whether the Trial Court erred by terminating Father's parental rights to the Child. As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254.

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In*

---

[4] Tenn. Code Ann. § 36-1-113(i).

*re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In combination with a best interest finding, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

On appeal, Father raises only the broad issue of whether the Trial Court erred in terminating his parental rights to the Child. In his brief, Father does not separately address grounds for termination and the best interest analysis in his argument section. Although it is somewhat unclear, it appears that the argument section of his brief is related only to the best interest analysis. Nonetheless, our Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (footnote omitted). Therefore, we will address on appeal the statutory grounds found by the Trial Court in terminating Father's parental rights, as well as the best interest analysis.

We first address the statutory grounds utilized by the Trial Court in terminating Father's parental rights to the Child. The Trial Court found that Father had abandoned the Child by willfully failing to visit and financially support him during the four months prior to Father's incarceration. Father was incarcerated on March 15, 2013, where he remained at the time of trial. Therefore, the relevant four-month period for purposes of the abandonment grounds at issue extended from November 15, 2012 through March 14, 2013. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

Tennessee Code Annotated § 36-1-113(g)(1) (2017) provides abandonment by a parent as a ground for the termination of parental rights. Since Father was incarcerated at the time the termination petition was filed, the relevant statute defining abandonment is

Tennessee Code Annotated § 36-1-102(1)(A)(iv) (2017). We note that the termination petition was filed in April 2017 and that the relevant statute in effect at that time concerning abandonment stated as follows in pertinent part:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . . . A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment[.]

Tenn. Code Ann. § 36-1-102(1)(A) (2017). The version of Tennessee Code Annotated § 36-1-102(1)(A)(iv) in effect in April 2017 required that a parent's failure to visit and support be willful.

Concerning the statutory ground of abandonment by failure to visit, the Trial Court found that Father had willfully failed to visit the Child during the four months prior to his incarceration. Mother testified that Father had not visited the Child since Thanksgiving 2008. However, Father testified that his last visit occurred in 2011. Considering either version of events, it is undisputed that Father did not visit with the Child at all during the relevant four-month period prior to his incarceration. Father argued during trial that Mother had not allowed him to visit the Child since 2011. Mother, however, denied that she had ever prevented Father from visiting with the Child. Stepfather also testified that he had never witnessed Mother denying visitation to Father. Father provided no evidence other than his own testimony to prove that Mother had prevented him from visiting the Child after 2011. The Trial Court clearly did not find Father's testimony credible. Father never completed the court-ordered anger management classes prior to his incarceration so any visitation Father received would have been required to be supervised by either Mother or the maternal grandmother. Although Father claims that Mother prevented him from visiting, Father never attempted to enforce his visitation in the Trial Court. The Trial Court found that the record was devoid of any petitions or orders wherein Father was seeking to

- 15 -

enforce his visitation and that Father had made no timely effort to enforce such visitation. Therefore, the Trial Court terminated Father's parental rights upon its finding, by clear and convincing evidence, that Father had abandoned the Child by willfully failing to visit him during the four months prior to his incarceration. Upon a review of the record, the evidence presented at trial supports the Trial Court's finding in this regard by clear and convincing evidence. Therefore, this ground is affirmed.

As to the ground of abandonment by failure to financially support, the Trial Court found that Father willfully failed to support the Child prior to his incarceration. This Court has held that "'[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005). Father was employed on a riverboat from September 2012 through his incarceration in March 2013, encompassing the relevant four-month period. Father had not paid child support for the Child consistently prior to his incarceration. Child support records reflect that Father paid no financial support for the Child in the four months prior to his March 2013 incarceration. The most recent child support payment made before Father's incarceration was in March 2012, well outside the relevant four-month period. At trial, Father did not testify of any child support payments made by him for the benefit of the Child during those four months. Father testified that he was unable to work for approximately a year due to a car accident in August 2011; however, he was medically cleared to return to work in September 2012. As a result of Father's accident, he netted $5,000 and admitted that he had not used any of the money he received to pay child support. Although Father was able to work and was employed full time on a riverboat during the entire four months prior to his incarceration, the records show that Father paid no child support during that time. Father provided the court with no reasonable excuse for his failure to support the Child. The evidence does not preponderate against any of the Trial Court's findings relevant to this ground. Upon a review of the record, we find and hold that Petitioners had proven by clear and convincing evidence that Father abandoned the Child by willfully failing to support him. We, therefore, affirm this ground.

Next, we will address whether the Trial Court erred by determining that termination of Father's parental rights was in the Child's best interest. Tennessee Code Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

    (i)      In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2019).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

- 17 -

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Trial Court considered the relevant factors in Tennessee Code Annotated § 36-1-113(i) in making its decision. Father had a lengthy history of criminal activity in his home prior to his incarceration. Father had been convicted of fourth-degree assault related to child abuse, trafficking marijuana, making harassing communications, and second-degree assault involving domestic violence. Father admitted during trial that he had previously struck his wife. Father also was convicted of three counts of first-degree rape, including one count of first-degree rape with serious physical injury, for which he is in prison serving a life sentence. Additionally, Father made statements during trial regarding his haircutting venture in prison and involvement with "another illegal operation in the facility" in order to obtain money above his assigned state pay. Although Father had completed some classes while in prison, it is clear from the evidence presented that Father has not made an adjustment to his conduct or circumstance such that the Child could safely be placed in his custody.

According to Father, the evidence supported that he had made attempts to maintain contact with the Child. However, the Trial Court found that Father had failed to maintain consistent visitation with the Child throughout the years. Father had not completed anger management treatment prior to his incarceration that would have lifted the supervised restrictions on his visitation with the Child. He had not seen the Child since at least 2011 by his own admission, which was approximately nine years prior to trial. Despite claiming that he was denied visitation, he had never filed any pleadings in court to attempt to enforce his visitation. Father testified that he wrote to the Child every month while he was incarcerated. However, Mother testified that Father began sending letters to the Child in late 2016 or early 2017 and that he sent a letter every two or three months. Father stated that he never received any correspondence back from the child in response to those letters. Mother stated that the Child knew of Father's existence but that he had a close relationship with Stepfather and referred to Stepfather as "Dad." The Trial Court found that no meaningful relationship existed between Father and the Child, which is supported by the evidence presented at trial.

Father had paid some child support throughout the years, although not regularly. No child support for the Child was paid by Father for approximately a year prior to his March 2013 arrest. Father had purchased some gifts for the Child following the parents' divorce, and while incarcerated, he had bought gifts for the Child from the proceeds of his haircutting venture in prison. However, Father had not consistently paid child support for the Child pursuant to the child support guidelines.

Father acknowledged in his brief that there was testimony presented during trial that the Child was well adjusted in his current living situation but argued that there was no expert proof to support that. However, we note that such expert testimony is not a pre-requisite for a determination by the Trial Court that terminating Father's parental rights is

in the best interest of the Child. *See In re S.A.C.*, No. M2009-00532-COA-R3-PT, 2009 WL 3172131, at *9 (Tenn. Ct. App. Sept. 30, 2009) ("[T]he best interest inquiry is fact intensive, and expert testimony is not a factor that must be given weight by the court."). The evidence presented demonstrated that the Child was thriving in the home of Mother and Stepfather and that he was doing very well in school. Father acknowledged during trial that he was grateful that Stepfather had taken on the role of a father figure for the Child and that Stepfather evidently loved the Child as his own son. The Trial Court found that Petitioners' home was safe and healthy for the Child. Conversely, Father is incarcerated serving a life sentence in prison. Based on the relevant statutory best interest factors, the Trial Court found that it was in the Child's best interest for Father's parental rights to be terminated. The evidence does not preponderate against any of the Trial Court's findings relevant to best interest. Upon a review of the record, we find and hold that Petitioners have proven by clear and convincing evidence that termination of Father's parental rights is in the Child's best interest. Therefore, we affirm the Trial Court's finding in this regard.

## **Conclusion**

The judgment of the Trial Court terminating Father's parental rights to the Child is affirmed in all respects. This cause is remanded to the Trial Court for collection of the costs assessed below and for enforcement of the Trial Court's order terminating Father's parental rights to the Child. The costs on appeal are assessed against the appellant, James H., II, and his surety, if any.


 s/ D. Michael Swiney_____
D. MICHAEL SWINEY, CHIEF JUDGE